FILED

2009 Nov-23  PM 12:18
U.S. DISTRICT COURT
N.D. OF ALABAMA

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
NORTHEASTERN DIVISION

| | | |
|---|---|---|
| BRENDA K. BYRD, | ] | |
| | ] | |
| Plaintiff, | ] | |
| | ] | |
| v. | ] | CV-08-BE-2023-NE |
| | ] | |
| MICHAEL J. ASTRUE, Commissioner | ] | |
| of the Social Security Administration, | ] | |
| | ] | |
| Defendant. | ] | |

## MEMORANDUM OPINION

Claimant Brenda Byrd applied for disability insurance benefits and supplemental security income benefits on September 26, 2006.  The Commissioner denied the claims.  The claimant then requested and received a hearing before an Administrative Law Judge.  On June 30, 2008, the ALJ held that Byrd was not disabled within the meaning of the Social Security Act, and, therefore, was not eligible for DIB or SSI payments.  Byrd then applied to the Appeals Council for review.  On October 22, 2008, the Appeals Council denied Byrd's request for review.  This denial constituted the final decision of the Commissioner of Social Security and the exhaustion of Byrd's administrative remedies.  The case is now before the court for judicial review pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3).

Based on the court's review of the record in this case and the parties' briefs, the court concludes that the decision of the Commissioner should be AFFIRMED.

## ISSUE PRESENTED

In this appeal, Byrd argues that the Commissioner erred in giving great weight to the

findings of Byrd's consultative physician, instead of the findings of Byrd's treating physician, in

determining that Byrd's anxiety and affective disability did not equal or meet the listing criteria.

## STANDARD OF REVIEW

The standard for reviewing the Commissioner's decision is limited.  This court must

affirm the Commissioner's decision if the Commissioner applied the correct legal standards and

if the factual conclusions are supported by substantial evidence. *See* 42 U.S.C. § 405(g); *Graham*

*v. Apfel*, 129 F.3d 1420, 1422 (11th Cir. 1997); *Walker v. Bowen*, 826 F.2d 996, 999 (11th Cir.

1987).

"No . . . presumption of validity attaches to the [Commissioner's] legal conclusions,

including determination of the proper standards to be applied in evaluating claims." *Walker*, 826

F.2d at 999. This court does not review the Commissioner's factual determinations *de novo*.  The

court will affirm those factual determinations that are supported by substantial evidence.

"Substantial evidence" is "more than a mere scintilla. It means such relevant evidence as a

reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 401

U.S. 389, 401 (1971).  The court must "scrutinize the record in its entirety to determine the

reasonableness of the [Commissioner]'s factual findings." *Walker*, 826 F.2d at 999. A reviewing

court must not look only to those parts of the record which support the decision of the ALJ, but

also must view the record in its entirety and take account of evidence that detracts from the

evidence relied on by the ALJ.  *Hillsman v. Bowen*, 804 F.2d 1179 (11th Cir. 1986).

## LEGAL STANDARD

Under 42 U.S.C. § 423(d)(1)(A), a person is entitled to disability benefits when the

person is unable to:

engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.

To make this determination, the Commissioner employs a five-step, sequential evaluation

process:

(1) Is the person presently unemployed?
(2) Is the person's impairment severe?
(3) Does the person's impairment meet or equal one of the specific impairments set forth in 20 C.F.R. Pt. 404, Subpt. P, App. 1?
(4) Is the person unable to perform his or her former occupation?
(5) Is the person unable to perform any other work within the economy?

An affirmative answer to any of the above questions leads either to the next question, or, on steps three and five, to a finding of disability.  A negative answer to any question, other than step three, leads to a determination of "not disabled."

*McDaniel v. Bowen*, 800 F.2d 1026, 1030 (11th Cir. 1986); *see* 20 C.F.R. §§ 404.1520, 416.920.

The ALJ must state with particularity the weight given different medical opinions and the

reasons therefore, and the failure to do so is reversible error. *Sharfarz v. Bowen*, 825 F.2d 278,

279 (11th Cir. 1987); *see also MacGregor v. Bowen*, 786 F.2d 1050, 1053 (11th Cir. 1986). The

ALJ should accord little weight to the report of a consultative physician *if* the report contradicts a

treating physician's report. *Edwards v. Sullivan*, 937 F.2d 580, 584 (11th Cir. 1991).  However,

a consultative physician's report that does not contradict a treating physician's report can

constitute substantial evidence to support the ALJ's decision. *See id.*

## BACKGROUND

Byrd was 49 years old at the time of the administrative hearing. (R. 27, 31).  She has an

eleventh grade education. (R. 31).  In the past, Byrd worked as a production clerk and a floor

supervisor. (R. 56-57).  She has smoked a pack of cigarettes per day for the last twenty-five

years. (R. 165).  Byrd is married with two children. (R. 165).  She states that after working as a

production planner for twenty-two years, on February 26, 2006 she "snapped" and quit her job.

(R. 165).  As a result, she has not been able to keep a job. (R. 165).  Byrd alleges that she is

unable to work because of her frequent panic attacks, anxiety, mental stress, and depression. (R.

33, 189).[1]  Byrd is insured for disability insurance benefits through December 31, 2010. (R. 118).

Dr. Robert Marlow treated Byrd after her nervous breakdown. (R. 167-82).  On August 6,

2006, Dr. Marlow examined Byrd after she complained  about her nerves. (R. 168).  He

diagnosed Byrd with anxiety and depression.  During his examination, Byrd told Dr. Marlow "I

think I am going crazy." (R. 169).  Dr. Marlow noted that Byrd appeared alert but very anxious.

(R. 169).  Dr. Marlow prescribed Xanax for Byrd and directed her to take it on a regular basis.

(R. 169).  He also gave Byrd samples of Effexor-XR.  On September 18, 2006, Dr. Marlow

examined Byrd and noted that she again appeared very anxious. (R. 169).  He again noted that

Byrd was anxious and depressed.

After she applied for disability insurance benefits and supplemental security income

benefits, Dr. Perm Gulati conducted a consultive exam. (R. 183).  During her examination, Byrd

complained of arm and neck pain, depression, and blindness in her right eye. (R. 183).  Byrd

reported that the pain is worse with prolonged sitting and laying flat. (R. 183).  Dr. Gulati

observed that she appeared a bit tense but was otherwise well-developed, well-nourished, and

neat and clean. (R. 183).  Dr. Gulati noted that Byrd did not appear to be in acute distress. (R.

183).  he also noted that Byrd had a full range of motion in her arms.  Further, he noted that she

---

[1]The record also contains evidence of Byrd's complaints of neck, shoulder, and back pain;
hand numbness, and right-eye blindness; however, Byrd concedes that her claim for disability
benefits is solely based on her mental problems. (doc. 7, p. 4).

had no difficulty getting on and off the examination table.  Dr. Gulati observed that Byrd was

able to squat, rise up, and walk without difficulty.  However, Dr. Gulati did find that Byrd was

legally blind in her right eye, anxious, and depressed. (R. 183, 185).  Dr. Gulati concluded that

Byrd's neck pain could be adequately treated with an anti-inflammatory medication and physical

therapy. (R. 185).  As such, Dr. Gulati concluded that Byrd could perform sitting, standing,

lifting, and carrying jobs without much difficulty. (R. 185).

On November 14, 2006, Dr. Thomas Tenbrunsel, performed a consultative psychological

evaluation on Byrd. (R. 188-89).  Byrd complained of neck pain and arm numbness. (R. 188).

She also complained of weekly panic attacks that last thirty minutes. (R. 189).  Dr. Tenbrunsel

observed that Byrd was severely depressed and diagnosed her with major depressive disorder and

panic anxiety. (R. 189).  He concluded "there is no psychological reason that she could not

maintain employment; understand, remember and carry out instruction; and respond

appropriately to supervisors and co-workers.  She is quite capable of managing any finances

should they accrue." (R. 189).  The ALJ gave "great weight" to Dr. Tenbrunsel's opinion

regarding Byrd's mental residual functional capacity and whether she met the anxiety and

affective disorder listing requirements. (R. 17).

On January 31, 2007, Dr. Donna Scott, one of Byrd's treating physicians, of the Mental

Health Center of Madison County performed a Psychiatric Evaluation on Byrd. (R. 229).  Dr.

Scott noted that Byrd appeared anxious and reported having suicidal thoughts. (R. 231).  Dr.

Scott concluded that Byrd suffered from post traumatic stress disorder and major depressive

disorder (R. 232).  In March 2007, Byrd reported to Dr. Scott that she was doing better. (R. 227-

28).  In December 2007, Byrd told Dr. Scott that she had not taken her medication in six months

and that she was having daily panic attacks and anxiety. (R. 241).

Because she was concerned about Byrd's thoughts of death, depression, tearfulness, and stress, Dr. Scott referred Byrd to the Crisis Residential Partial Hospitalization Program. (R. 247). After arriving at the Partial Hospitalization Program on February 21 2008, she left against medical advice the next day. (R. 245). On the day Byrd left the Program, a physician provisionally diagnosed Byrd with a Global Assessment of Functioning (GAF) score[2] of 40. (R. 252). However, the ALJ noted that Byrd's pre-admission screening form indicated that Byrd had a GAF score of 65. (R. 247-48).

In March 2008, Byrd returned to the Mental Health Center for treatment. (R. 256-58). Byrd's therapist reported that Byrd experienced less anxiety when she took her medicine and performed breathing exercises. (R. 256). When she returned to her therapist in April 2008, Byrd reported that she felt so restless that she could not sit still; however, her therapist noted that he did not observe signs of restlessness. (R. 260). Also, Byrd reported a reduction in the frequency of her panic attacks. (R. 260).

The ALJ found that Byrd engaged in substantial gainful activity after her alleged onset date–February 26, 2006. (R. 13). Byrd had two short periods of work activity after February 2006. (R. 117). She worked for two days for CF Flag Company and from May 11,2007 to June 29, 2006 for Coast Personnel Services. (R. 35-36, 116). Byrd performed administrative work for Coast Personnel Services and the company paid her $780, $2400, and $180 in May, June, and July, respectively. (R. 115).

---

[2]The ALJ noted that a GAF of 41-20 indicates serious mental impairment, a GAF score of 50-60 indicates moderate mental impairment, and a GAF score of 61-70 indicates only mild impairment.

The ALJ found that the medical evidence indicated that Byrd had post traumatic stress disorder, depression, degenerative disc disease of the cervical spine, and possible blindness in the right eye. (R. 14). The ALJ stated that these impairments were severe, but not severe enough to meet one of the impairments listed in 20 CFR pt. 404, subpart P, app. 1. (R. 14).

The ALJ evaluated Byrd's impairments under Section 12.04 (affective disorders) and 12.06 (anxiety disorders) of the listings. (R. 14). The ALJ stated that Byrd's mental impairments, considered singly and in combination, did not meet or medically equal the criteria of either listing. (R. 14). In making this finding, the ALJ concluded that Byrd's mental impairments failed to meet the requirements under listings 12.04 and 12.06 because they did not result in at least two of the following: 1) marked restriction of activities of daily living; 2) marked difficulties in maintaining social functioning; 3) marked difficulties in maintaining concentration, persistence, or pace; or 4) repeated episodes of decompensation, each of extended duration. (R. 14).

Next, the ALJ assessed whether Byrd retained the residual functioning capacity ("RFC") to perform the requirements of her past relevant work (R. 14-19). Based on Byrd's testimony and medical records, the ALJ stated that Byrd retained the RFC to perform medium work. (R. 14). He also found that Byrd could frequently climb ramps and stairs, balance, stoop, kneel, crouch, crawl, and occasionally climb ladders, ropes, and scaffolds. (R. 14). The ALJ stated that Byrd was not limited in her ability to push or pull with her hands and feet. (R. 15). On the other hand, the ALJ found that Byrd lacks binocular vision; thus, she is limited in her ability to see across distances and perceive depth. (R. 15).

The ALJ concluded that Byrd should avoid concentrated exposure to extreme cold, vibration, hazardous machinery, and unprotected heights. (R. 14). However, the ALJ found that

Byrd is able to maintain attention and concentration for two hour periods, interact appropriately in brief, casual encounters with the public, and respond to simple, gradual, and infrequent changes in work routine. (R. 15).  The ALJ stated that Byrd can understand, remember, carry out instructions, and respond appropriately to supervisors and co-workers; but, she needs a low stress job that is limited to simple, routine, repetitive tasks, and simple work related decisions. (R. 15).

During Byrd's hearing, the ALJ posed a hypothetical situation to the vocational expert ("VE") based on his findings of Byrd's RFC.  The VE stated that, based on the RFC described by the ALJ, Byrd would not be able to perform any of her past relevant work. (R. 57-58).  Next, the ALJ asked the vocational expert whether jobs exist in the national economy for an individual with Byrd's age, education, work experience, and RFC. (R. 57-58).  The VE responded that, based on the RFC described by the ALJ, hand packager, janitor, and warehouse worker jobs exist for an individual with Byrd's age, education, work experience, and RFC. (R. 58).  The VE stated that her testimony was consistent with the Dictionary of Occupational Titles. (R. 60).

## DISCUSSION

Byrd argues on appeal that the ALJ erred when he gave great weight to Byrd's consultative physician's opinion in determining that Byrd's disability did not meet or exceed the anxiety and affective disorder listing requirements. (doc. 7, p. 11).  Byrd asserts that the ALJ improperly relied on the consultative report instead of on Byrd's treating physician's determination that she had a GAF score of 40.

The listings describe an affective disorder as "[c]haracterized by a disturbance of mood, accompanied by a full or partial manic or depressive syndrome. Mood refers to a prolonged emotion that colors the whole psychic life; it generally involves either depression or elation." 20

C.F.R. Part 404, Subpart P, Appendix 1, Listing 12.04 (2009).  In anxiety-related disorders,

"anxiety is either the predominant disturbance or it is experienced if the individual attempts to

master symptoms; for example, confronting the dreaded object or situation in a phobic disorder

or resisting the obsessions or compulsions in obsessive compulsive disorders." Listing 12.06.

Both listing 12.04 and 12.06 have three sets of requirements–A, B, and C–and a claimant

meets each listing's required level of severity when she satisfies the requirements in A and B or

the requirements in A and C.  Byrd argues that substantial evidence in the record shows that her

impairment meets the A and B requirements of listings 12.04  and 12.06; however, the ALJ

found that Byrd did not meet the section B requirements under either listing.

Under section B of listings 12.04 and 12.06, a claimant must demonstrate that her

symptoms result in at least two of the following:

1. Marked restriction of activities of daily living; or
2. Marked difficulties in maintaining social functioning; or
3. Marked difficulties in maintaining concentration, persistence, or pace; or
4. Repeated episodes of decompensation, each of extended duration.

20 C.F.R. Part 404, Subpart P, Appendix 1, Listing 12.04, 12.06 (2009).

The ALJ concluded that the evidence did not support a finding that Byrd's symptoms

resulted in at least two of the above requirements.  In making his decision, the ALJ gave great

weight to the opinion of Dr. Tenbrusel–a consultative physician who examined Byrd only once.

On November 14, 2006, Dr. Tenbrusel reported that Byrd appeared to be severely

depressed–an observation that Byrd's treating physicians also noted.  He diagnosed her with

major depressive disorder and panic anxiety.  After reviewing and considering the contents of

Byrd's medical records, Dr. Tenbrusel recommended that Byrd see a psychiatrist for her anxiety

and depression.  He also stated that "there is no psychological reason that she could not maintain

employment."

Byrd argues that the ALJ improperly relied on Dr. Tenbrusel's report instead of on Byrd's

treating physician's determination that she had a GAF score of 40.  Byrd correctly points out that

the report of a non-examining doctor is accorded little weight if it contradicts an examining

doctor's report; such a report, standing alone, cannot constitute substantial evidence. *Edwards v.*

*Sullivan*, 937 F.2d 580, 585 (11th Cir. 1991).  However, Byrd's argument fails because Dr.

Tenbrusel's report is supported by other evidence in the record and does not contradict the

reports of Byrd's treating physicians. *See id.*

Dr. Tenbrusel's report is supported by substantial evidence on the record.  Dr. Marlow

treated Byrd after her alleged disability onset date.  He noted that Byrd suffered from anxiety and

depression.  Dr. Marlow prescribed medicine to alleviate Byrd's symptoms but he made no

recommendation that Byrd could not or should not work.  The report of Dr. Marlow is

completely consistent with Dr. Tenbrusel's report; therefore, the ALJ did not err in giving great

weight to Dr. Tenbrusel's consultative report.

Ironically, Byrd's own actions support the findings in Dr. Tenbrusel's report.  Although

Byrd alleges that she has been unable to work because of frequent panic attacks and anxiety that

began on February 26, 2006, she has worked two jobs and earned at least $3360.00 since the

onset of her alleged disability.  Byrd's working while allegedly disabled further supports Dr.

Tenbrusel's recommendation that she is able to work despite her impairments.

Byrd alleges that Dr. Tenbrusel's November 2006 recommendation regarding Byrd's

ability to work contradicts the February 2008 physician's psychiatric assessment that Byrd had a

GAF score of 40–indicating at least severe mental impairment.  However, the 2006

recommendation and the 2008 assessment do not contradict each other because the

recommendation specifically refers to Byrd's ability to work while the assessment merely makes

a *provisional* diagnosis regarding Byrd's GAF score at a particular moment in time.[3]

      Dr. Tenbrusel's report indicates that Byrd suffers from depression and anxiety disorder

and accurately reflects that conclusions of Byrd's treating physicians.  Most importantly, Dr.

Tenbrusel provided an interpretation of Byrd's condition vis-a-vis the limitations those

conditions placed on Byrd's abilities.  Because this information was not contained in the 2008

physician psychiatric assessment, the court cannot say that Dr. Tenbrusel contradicted the

findings in the assessment.  Consequently, the ALJ did not err in relying on his report.

### CONCLUSION

      For the reasons stated above, the court concludes that the decision of the Commissioner is

supported by substantial evidence and is due to be AFFIRMED.

DONE and ORDERED this 23rd day of November, 2009.

 

                                     KARON OWEN BOWDRE
                                     UNITED STATES DISTRICT JUDGE

---

[3]Byrd asserts that if she has a GAF score of 40–indicating at least severe mental impairment–then she cannot be expected to work; however, Byrd's argument depends on the premise that a GAF score is static.  The fact that the physician psychiatric assessment provides a *provisional* GAF score of 40 shows that a GAF score can change.  Further, the record shows that two days before a physician provisionally evaluated Byrd with a GAF score of 40, a physician evaluated Byrd with a GAF score of 65–a score indicating only mild impairment.